# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLORADO
# Chief Judge Marcia S. Krieger

Civil Action No. 13-cv-01036-MSK

IN RE:

**CHARLES ALLEN ARNOLD,**

**PULSEWAVE LLC,**

    Plaintiff/Appellee,

v.

**CHARLES A. ARNOLD,**

    Defendant/Appellant.

## OPINION AND ORDER ON APPEAL

**THIS MATTER** is before the Court on appeal from the April 3, 2013 Order and Judgment of the U.S. Bankruptcy Court for the District of Colorado, awarding damages and entering judgment in favor of the Plaintiff PulseWave LLC. The Bankruptcy Court determined that the Debtor Charles A. Arnold is not entitled to discharge pursuant to 11 U.S.C. § 727(a)(4) and that the damage award in favor of Pulsewave LLC is nondischargeable pursuant to 11 U.S.C. § 523(a)(4) and (6). In reviewing this matter, the Court has considered the designated record and written arguments of the parties, including the Debtor's Opening Brief **(#10)**, PulseWave's Response Brief **(#11)**, and the Debtor's Reply Brief **(#13)**.

Exercising jurisdiction pursuant to 28 U.S.C. § 158, with regard to the Bankruptcy Court's April 3, 2013 Order and Judgment, the Court **AFFIRMS, IN PART, and REVERSES AND VACATES, IN PART**.

## I. PROCEDURAL BACKGROUND

In 2007, Charles A. Arnold (the Debtor) and a company in which he was the majority owner, Quantic Research Systems, Inc. (Quantic), filed for bankruptcy protection under Chapter 11. In the context of such case, the Debtor and Quantic initiated an adversary proceeding against PulseWave and others, seeking a declaratory judgment that Quantic was the legal owner of five patents. PulseWave filed a counterclaim for a declaratory judgment that it was the equitable owner of the patents. PulseWave argued that the Debtor had surreptitiously assigned the patents to Quantic and that they rightfully belonged to PulseWave. After a trial, the Bankruptcy Court found that PulseWave was the equitable owner of the patents. The Bankruptcy Court ordered the Debtor and Quantic to convey the patents back to PulseWave. They did.

Subsequently, the Debtor's bankruptcy case was converted to one under Chapter 7. Following the conversion, PulseWave, John Arnold (the Debtor's brother), and Soil Enhancement Technologies (SET)[1] initiated an adversary proceeding against the Debtor challenging his right to obtain a discharge. PulseWave brought two claims. First, it sought a denial of discharge pursuant to 11 U.S.C. § 727(a)(4) for failure to disclose the Debtor's involvement with the Bear Mountain Company in the Debtor's bankruptcy Schedules and Statement of Financial Affairs. Second, PulseWave sought to except from discharge under 11 U.S.C. § 523(a)(4) and (6) the debt owed to it by the Debtor based on breach of fiduciary duty, fraud, civil theft, and conversion in conjunction with the previous transfer of the patents to Quantic. PulseWave also requested quantification of the Debtor's liability and entry of a money judgment.

After a bench trial, the Bankruptcy Court found in favor of PulseWave on both the denial of discharge and exception from discharge claims. It determined that the Debtor was not entitled

---

[1] Neither John Arnold nor Soil Enhancement Technologies (SET) are parties to this appeal.

to a discharge pursuant to § 727(a)(4)(A) because he failed to disclose his business dealings with the Bear Mountain Company in response to Question 18 of his Statement of Financial Affairs. In addition, the Bankruptcy Court determined that pursuant to §523(a)(4) and (6), the Debtor's acts of conversion and civil theft resulted in a non-dischargeable debt.[2] The Bankruptcy Court quantified the loss at $5,050,000, then trebled it and added attorney fees pursuant to Colorado's Civil Theft Statute, Colo. Rev. Stat. § 18-4-401, which resulted in a money judgment in favor of PulseWave and against the Debtor in the amount of $15,150,000.

## II.  BACKGROUND FACTS

### A.  The Debtor's Involvement in the Bear Mountain Company

In 1964, the Debtor acquired 57 acres of vacant land in Indian Hills, Colorado, from his uncle for $10.00. In 1978, in consideration for payment of $1.00, the Debtor quit claimed the property to the "Bear Mountain Company," an entity for which no organizational documents exist in the record. The Debtor acted as "Executive Trustee" of the Bear Mountain Company until at least October 2002, during which time he executed several deeds of trust that encumbered title to the property. The Debtor maintains that after 1978 he had no interest in the real property, that the Bear Mountain Company is a "business trust," and that he is not a beneficiary of the trust. He admits, however, that in November 2002, the Bear Mountain Company leased him the subject real property for a 25-year term, in exchange for the payment of property taxes and maintenance of the property.

### B.  PulseWave and the Transfer of Patents

In 1994, the Debtor built a prototype mill that used a technology called resonance disintegration. The Debtor obtained two patents for the mill, which he assigned to CA Arnold &

---

[2] It is somewhat unclear why this determination was made in light of the denial of discharge of all of the Debtor's debts, but perhaps the dischargeability determination was simply the vehicle for quantification of the Debtor's obligation to PulseWave.

Associates, Inc. (CAAA), a company that he controlled. In 1998, the Debtor and his brother John Arnold formed PulseWave LLC to develop the technology. PulseWave LLC had three members — CAAA, John Arnold, and William Hahn. Three additional patents related to the resonance disintegration technology were obtained. Of the five patents, PulseWave owned three and was the exclusive licensee of two owned by CAAA. The patents and licenses were the principle assets of PulseWave, without which it could not operate.

During the developmental stages of PulseWave, John Arnold provided operational capital, but by late 2002, he was unwilling to contribute additional capital. Beginning in 2003, Jim Yates began contribution of capital in exchange for managerial control of PulseWave pursuant to the PulseWave Development and Investment Agreement. From 2003 through 2005, the relationship between John Yates and John Arnold, on one hand, and the Debtor, on the other, deteriorated. In 2005, the Debtor, acting as majority owner of CAAA and a manager of PulseWave, surreptitiously assigned all five patents to Quantic. The patents remained with Quantic until 2008, when the Bankruptcy Court ordered that they be returned to PulseWave.

### III.  STANDARD OF REVIEW

The Court reviews the Bankruptcy Court's legal determinations *de novo* and its factual findings under a clearly erroneous standard. *In re Vaughn*, 765 F.3d 1174, 1181 (10th Cir. 2014).

### IV.  DISCUSSION

The Debtor presents two issues on appeal: (1) Did the Bankruptcy Court err in concluding that he should be denied a discharge under 11 U.S.C. § 727(a)(4)(A) for failing to disclose his involvement with the Bear Mountain Company on his Statement of Financial

Affairs? (2) Did the Bankruptcy Court err in finding that PulseWave was injured as a result the Debtor's transfer of the patents to Quantic and in quantifying its loss?

### A. Denial of Discharge

Section 727(a)(4)(A) directs a bankruptcy court to grant a debtor a discharge unless "the debtor knowingly and fraudulently, in or in connection with the case, made a false oath or account." A "false oath" may be either a false statement or omission in the debtor's schedules or statement of affairs. *In re Garland*, 417 B.R. 805, 814 (B.A.P. 10th Cir. 2009).

In this case, the Debtor completed his Statement of Financial Affairs and signed them under penalty of perjury. Question 18 of the Statement of Financial Affairs required him to disclose:

> the names, addresses, taxpayer identification numbers, nature of businesses, and beginning and ending dates of **all businesses in which the debtor was an officer, director, partner, or managing executive of a corporation, partner in a partnership, sole proprietor, or was self-employed in a trade, profession, or other activity either full-time or part-time within six years immediately preceding the commencement of this case . . . [.]**

The Debtor responded to this question by listing his involvement with various corporations and limited liability companies. He did not, however, disclose any information about the Bear Mountain Company or his role as "Executive Trustee" in response to this question or elsewhere in his Statement of Affairs or Schedules.[3] The Bankruptcy Court concluded that the Debtor was required to disclose his involvement with Bear Mountain and that his omission of such information was made knowingly and fraudulently.

---

[3] The Debtor did not disclose his involvement with the Bear Mountain Company or his interest in the 57 acres *anywhere* in his Schedules. For example, the Debtor did not disclose ownership of the real property on Schedule A nor his interest in the 25-year lease on the property in Schedule G. Either of these omissions could have constituted a false statement by omission.

The Debtor argues on appeal that the Bankruptcy Court erred in finding that he was required to disclose his involvement with the Bear Mountain Company in response to Question 18. He steadfastly maintains that he was a trustee of a business trust and therefore such information was not required in response to Question 18. This gives rise to a legal issue — is a debtor required to disclose his role as the trustee of business trust in response to Question 18 of the Statement of Financial Affairs?

Assuming, without deciding, that Bear Mountain Company was a business trust,[4] this Court agrees with the Bankruptcy Court that the Debtor was required to disclose the existence of the trust and his status as the Executive Trustee in response to Question 18. Although Question 18 does not expressly ask a debtor to disclose "business trusts," it requires disclosure of all businesses in which the Debtor served as an officer, director, partner, or managing executive. The examples of businesses — corporations, partnerships, and sole proprietorships — are illustrative, not exclusive. The purpose of the disclosure is to allow a bankruptcy trustee to investigate and determine what property the Debtor owns (or has owned and has improperly transferred) for purposes of estate administration.

---

[4] There is no statutory scheme in Colorado providing for the formation of a "business trust." There are, however, statutory references to this type of entity in various contexts. *See, e.g.,* Colo. Rev. Stat. § 6-1-102(6) (under the Consumer Protection Act, "person" includes a business trust); C.R.S. § 7-101-401(17) (under the Business Corporation Act, "entity" includes a business trust); § 38-13-102(3.5) (under the Unclaimed Property Act, "business association" includes a business trust). In *In re Green Valley Financial Holdings*, 32 P.3d 643 (Colo. App. 2001), the Colorado Court of Appeals observed that a business trust is a business organization in trust form. The purpose of a business trust is not to hold and conserve a particular property, but to provide a medium for the conduct of business and the sharing of profits. 32 P.3d at 645.

In this case, interestingly, there is no evidence of a trust agreement, which would designate corpus, beneficiaries, or the identity and duties of the trustee. In addition, although the Debtor maintains that the Bear Mountain Company is a business trust, he adamantly asserts that the trust carries on no business whatsoever, and that its sole purpose is to hold title to real property.

Even if one were to assume that Question 18 only required disclosure of interests reflected in the specific examples, disclosure of the Bear Mountain Company was nevertheless required. Section 101(9)(A) of the Bankruptcy Code defines "corporation" as including a "business trust." Thus, the Debtor's characterization of Bear Mountain Company as a business trust identifies it as an entity subject to disclosure. In addition, the Debtor's role as the "Executive Trustee" was the same as a managing executive.

The Debtor was therefore required to disclose his involvement in the Bear Mountain Company in response to Question 18. Because there is no challenge to the Bankruptcy Court's finding that the Debtor's failure to disclose his involvement with the Bear Mountain Company was made knowingly and with fraudulent intent, the Bankruptcy Court's judgment denying discharge under § 727(a)(4)(A) is **AFFIRMED**.

### B. Award of Damages

Generally, a denial of discharge under § 727(a) renders moot the question of dischargeability of particular debts. Therefore this Court need not address the findings made by the Bankruptcy Court with regard to dischargeability of the debt owed by the Debtor to PulseWave under 11 U.S.C. § 523.

Instead, the Court focuses on the Debtor's challenge to the Bankruptcy Court's quantification of his debt to PulseWave. The Bankruptcy Court found that the Debtor's actions in assigning the patents to Quantic constituted conversion and civil theft, and it awarded damages to PulseWave in the amount of $15,150,000. The Debtor does not dispute the Court's determinations as to liability. He challenges only the calculation of damages.

In calculating damages, the Bankruptcy Court reasoned that although the patents ultimately were returned to their rightful owners, PulseWave may have suffered a loss during the

time that they were with Quantic.[5] The Bankruptcy Court focused on the value of the patents before the Debtor transferred them from PulseWave to Quantic (pre-conversion) as compared to their value when they were returned to PulseWave (post-conversion). The Court reasoned that the difference between the two values would measure the loss suffered by PulseWave.

In determining the pre-conversion value, the Court first recognized that the patents were the only valuable assets of PulseWave or Quantic. Then it turned to an offer by Jim Yates in 2005 to purchase John Arnold's 21.6% interest in PulseWave for $2.7 million, which offer was contingent on PulseWave successfully regaining title to the patents. (This offer was contained in a Draft Letter of Intent and accompanying emails.) Using this price, the Court reasoned that a 100% interest in PulseWave would have been valued at $12,500,000 if PulseWave had title to the patents.[6]

In determining the post-conversion value, the Bankruptcy Court focused on the value of Quantic after it received the patents noting that patents were Quantic's only valuable assets. The Court referred to the Quantic Common Share Purchase Option executed by Quantic in 2006. In this option, Quantic offered Hendricks Holding Company a 60% interest in Quantic for $5,000,000. Using the same method as above, the Court extrapolated that 100% interest in Quantic at the time of the offer would have been valued at $8,300,000. Of the $8,300,000, the

---

[5] The Bankruptcy Court noted that PulseWave did not advance any theory of recovery based on lost profits during the time the Debtor had unauthorized control of the intellectual property.

[6] The Court acknowledged that this offer was actually made *after* the Debtor had converted the patents. But because the offer was made very shortly after the conversion and because it was contingent on PulseWave regaining title to the patents, the Court concluded that the offer sufficiently evidenced the value of the patents before the conversion.

Court determined that $7,450,000 could be attributed solely to PulseWave's five patents.[7] It therefore concluded that the post-conversion value of the patents was $7,450,000.

The Bankruptcy Court then compared the pre- and post-conversion values and found that the post-conversion value was $5,050,000 less than the pre-conversion value. It concluded that this amount represented the diminution in value of the patents while they were under the unauthorized control of the Debtor and Quantic. The Bankruptcy Court therefore found that PulseWave suffered a loss in the amount of $5,050,000. The Court went on to reason that because the Debtor's act constituted civil theft under Colo. Rev. Stat. § 18-4-401, PulseWave was entitled to treble damages totaling $15,150,000 and attorney fees to be determined later.

The Debtor argues that the Bankruptcy Court erred by relying on the Draft Letter of Intent, and accompanying emails, and the Quantic Common Share Purchase Option as the bases of valuation for the patents. He argues that these documents are speculative offers and therefore do not constitute credible and competent evidence of value. He also argues that the Bankruptcy Court clearly erred in calculating the pre-conversion value. He asserts that the $2.7 million purchase price reflected in Mr. Yates's offer could not be entirely attributable to the value of the patents. The Debtor points out that the $2.7 million offer included the assumption of $1,597,298 in PulseWave debts by Mr. Yates. Thus, he argues, only $1,102,702 could be fairly regarded as the value of a 21.6% interest in PulseWave at the time the offer was made and, under the Bankruptcy Court's reasoning, the total pre-conversion value was only $5,105,101. The Debtor argues that because this value is less than the post-conversion value found by the Bankruptcy Court, PulseWave suffered no loss in the value of the patents.

Generally, the measure of damages for conversion is the value of the converted property plus interest thereon. *Masterson v. McCroskie*, 194 Colo. 460, 465 (Colo. 1978). However, the

---

[7] The remaining $850,000 was attributed to patents converted from SET.

amount of damages for the conversion of property is diminished by its recovery or acceptance by a person entitled to its possession. Restatement (Second) of Torts § 922(1).[8]

Assuming that the offers relied on by the Bankruptcy Court constituted sufficient evidence by which to determine the value of the patents, this Court finds clear error in the calculation of the pre-conversion value of the patents. Paragraphs B and C of the Draft Letter of Intent specify that, at the time of the offer, PulseWave had $1,597,298 in outstanding obligations to John Arnold for rent and interest, and past loans. Paragraph D of the letter clearly states that the $2.7 million offer includes payment of the total amount of obligations owed to John Arnold. Thus, only $1,102,702 was properly attributable to the patents. Following the methodology used by the Bankruptcy Court, the total value of the patents owned by PulseWave at the time of Mr. Yates's offer was $5,105,101.85. This compares to a post-conversion value of the patents of $7,450,000. Thus, it would appear that the value of the patents increased while owned by Quantic and that they were more valuable when returned to PulseWave. Accordingly, PulseWave suffered no loss as result of the Debtor's actions and no award of damages was appropriate. In other words, no debt is owed by the Debtor to PulseWave on the theories asserted. Accordingly, the money judgment in favor of PulseWave and against the Debtor is **REVERSED AND VACATED.**

---

[8] This measure of damages for conversion was the approach taken by the parties and the Bankruptcy Court, notwithstanding the fact that the converted property in this case was not personal property, but rather intangible intellectual property. Because a challenge to the approach was not raised by the parties before the Bankruptcy Court or on appeal, the Court does not undertake resolving the issue.

## V.  CONCLUSION

For the forgoing reasons, the Court **AFFIRMS, IN PART, and REVERSES AND VACATES,  IN PART,** the Bankruptcy Court's April 3, 2013 Order and Judgment.  The money judgment of $15,150,000 in favor of PulseWave is vacated.  The Court expresses no opinion on the propriety of the Bankruptcy Court's award of attorney fees.

Dated this 2nd day of December, 2014.

**BY THE COURT:**

_Marcia S. Krieger_

Marcia S. Krieger
Chief United States District Judge